# Lehman, Durr & Co. *v.* Robinson, and Robinson *v.* Lehman, Durr & Co.

*The Power of the Tax-Collector to Assess Escaped Taxes.*

1. *When the legislature employs different language in a subsequent statute in the same connection, the courts will presume a change of the law is intended.* The legislature must be presumed to know both the language employed in the former acts, and the judicial construction placed upon them; and if in a subsequent statute on the same subject it uses different language in the same connection, the courts must presume that a change of the law was intended, and after a consideration of the spirit and letter of the statute, will give effect to its terms according to their proper signification.

2. *In the interpretation of an act, all of it must be considered.*—In construing a statute, regard must be had to the whole act; and if need be, to,

[Lehman, Durr & Co. v. Robinson.]

·other statutes passed on the same subject; for the meaning of a clause is sometimes shown by another that is not stated in connection with it.

3. *A person assessed imperfectly, has not escaped the assessor.*—One who has been assessed for taxation by the assessor, although in an imperfect manner, is not "a person who has escaped the assessor" within the meaning of the revenue law.

4. *No assessment of property should be made without notice to the tax-payer.* No assessment of property on the ground that it has escaped taxation should be made without notice to the tax-payer, if accessible; but the court does not decide that the assessment would be void if made without notice.

5. *To correct an improper assessment, the courts must not be sought in the first instance.*—If an erroneous, excessive or unauthorized assessment has been made, the remedy under existing laws does not lie in a resort to the courts in the first instance.

6. *The complaint of erroneous assessment should be made at the August term of the Commissioners Court.*—When a complaint is made of a regular assessment, it must be brought before the Court of County Commissioners (or courts exercising its powers), at the August term. And if the assessment has been made at an irregular time, complaint should be made to the first term afterwards.

7. *The collection of taxes should not be coerced till the Court of County Commissioners has acted in the case.*—If complaint be made that an assessment upon property which has escaped taxation is excessive, or illegal, it ·should not be collected by coercive process until the Court of County Commissioners has acted in the case. Upon its failure to correct an illegal or ·erroneous assessment, the courts of the country may redress the wrong.

APPEAL from the City Court of Montgomery.

Tried before the Hon. JOHN A. MINNIS.

Patrick Robinson, tax-collector of the county of Montgomery, while engaged in the collection of taxes assessed during the year 1876, was informed that Lehman, Durr & Co. had escaped the tax-assessor as to some subjects of taxation and species of property for a number of years. Acting upon the information, and without making any demand on the said firm for a list of its taxable property, the said tax-collector proceeded, on the 12th day of March, 1877, to assess Lehman, Durr & Co. as persons who had escaped the tax-assessor in the years 1869, 1870, 1871, 1872, 1873, 1874, 1875 and 1876. And as the result of such assessment, the tax-·collector demanded of the said firm on the same day, thirty-nine thousand six hundred and eighty-four 49-100 dollars as ·escaped taxes.

Thereupon, Lehman, Durr & Co. filed an application in the City Court of Montgomery, praying it to "grant a writ of *mandamus* directed to said Patrick Robinson, as tax-collector of said county, commanding and requiring him to vacate and annul said several pretended assessments, and forbidding and restraining him from reporting said several pretended assessments to the probate judge of said county;" or, if on the facts they are not entitled to the writ of *mandamus*, then that the

"writ of *certiorari* issue directed to said Patrick Robinson, as tax-collector of said county, commanding and requiring him to certify said several pretended assessments to the court, and that the same be here quashed, vacated and annulled," &c.

The petition for a writ of *mandamus* or a writ of *certiorari* was filed on the 16th day of March, 1877, and on the 24th day of the same month, Patrick Robinson, the respondent, "moved the court to strike it from the files of the court upon the following grounds, viz.: *First*, that said petition was not authorized by the law of the land; and *second*, that said petition did not show a case within the jurisdiction of the court." The court overruled the motion, and the respondent excepted, and then filed his answer.

Among other matters, it "denies that the said Lehman, Durr & Co. rendered to the tax-assessor of the said county a full, accurate and complete list of all the taxable property owned by them in the said county, and a complete and accurate list of all the subjects of taxation for and on which the said Lehman, Durr & Co. were and are liable to pay taxes in said county in and for each, or any, or all of the following years, viz.: 1869, 1870, 1871, 1872, 1873, 1874, 1875 and 1876, and the respondent denies that the tax-assessor of said county assessed taxes against all the taxable property owned by said petitioners, or against, or on all the subjects of taxation on which the said petitioners were liable to pay taxes in said county, in and for each of the said years, or that the said petitioners paid State and county taxes on all their said property, or on all the subjects of taxation on which the said petitioners were liable to pay taxes in the said county in, and for each, or any, or all of the said years. This respondent denies, that on the 12th day of March, 1877, or on any other day, he assessed taxes on or against any property owned by the said petitioners, or on any subjects of taxation on which they were or are liable to pay taxes, which had been assessed for taxes by the tax-assessor of the said county, for either, or any, or all of the said years, and upon which the said petitioners had paid taxes that had accrued, and were and are due to the said State and county, in and for each, or any of the years above mentioned."

To the answer of the respondent, the petitioners demurred; the court overruled the demurrer, and they excepted. The petitioners then filed a replication, which repeated the allegations that had been denied in the answer of the respondent, and averred the petitioners "are not liable to be assessed for taxation, or to pay taxes on salaries or gains, or incomes

[Lehman, Durr & Co. v. Robinson.]

:and profits; on money loaned and solvent credits, or credits ·of value; on money employed in buying or trading in paper; ·on property, real and personal; or on gross amount of commissions as factors, brokers and commission merchants, as set forth for the said several years respectively,. in said answer of respondent, and on which he has assessed taxes ·for each of said years, as stated in his said answer."

The respondent demurred to the replication; the court overruled the demurrer, and the respondent excepted.

The court then granted "a writ of *certiorari* directed to respondent, Patrick Robinson, as tax-collector of Montgomery ·county, commanding and requiring him as such tax-collector, to return and certify to the court, on the ninth day of April, 1877, the several assessments of taxes made by him against said petitioners" for the years above mentioned. The writ was duly issued, and the respondent made his return· in accordance with its requirements. The petitioners demurred to it; but the court overruled the demurrer, and the petitioners excepted.

"Before the overruling of said demurrer, the respondent claimed and requested the court should render its judgment dismissing said petition and *certiorari*. The court refused to render such judgment and adjudged that evidence outside ·of what appeared in the pleadings and proceedings should and would be received and heard as to the jurisdictional facts, denied by respondent, and that the *onus* of proof as to such facts was on the petitioners. To each of aforesaid rulings and decisions of the court (except as to *onus* of proof) the respondent duly excepted, and to said ruling as to *onus* of proof, the petitioners excepted.

"And thereupon, against the separate and successive objections and exceptions of respondent, duly made and taken successively as well as separately to each witness introduced by petitioners, and also to each part of the evidence introduced by petitioners," the petitioners read in evidence the books of assessments of taxes for each of the foregoing years. The petitioners then "introduced one McDuffie" as a witness, who testified "that he was tax-assessor of said county from about July, 1868, to December, 1874; that in the spring of 1869, while engaged in the assessment of taxes, he furnished the petitioners a blank printed list for assessment of taxes; that a few days afterwards he went to the office of petitioners for the purpose of assessing them for taxes, and ·called from said blank list, all the items of property and subjects of taxation which in any way related to the busi-

-ness of petitioners; and that he knew petitioners were
·engaged in the business of selling exchange, factors and com-
mission merchants, and warehouse-men; that when he called
·out the item of salaries, gains, income and profits, for the
preceding year, John W. Durr, one of the petitioners, said
·that they ought not to be assessed on said subject of taxa-
·tion; as all the gains, incomes and profits of petitioners
·consisted of their commissions as factors, brokers and com-
·mission merchants, and for storage upon which they were
taxed, and because the partners of the firm were liable to be
taxed on their individual income derived from the partner-
ship, and the witness being of the same opinion, declined to
assess the firm thereon; that when he called the item of
money loaned, solvent credits, &c., that said Durr stated that
the indebtedness of said Lehman, Durr & Co. exceeded the
amount of their money loaned, solvent credits or credits of
value; that when he called the item of money employed in
buying or trading in paper, or in regular exchange, said
Durr stated that they had no money employed in that busi-
ness—and upon statements of said Durr, and on such other
information as he was able to gather, witness as tax-assessor
declined to assess any amount on any of said subjects of
·taxation against said Lehman, Durr & Co. . . . The
witness testified that these facts were substantially true of all
the subsequent years in which he was tax-assessor, except
the year 1870. In that year, he assessed the said firm " on
$50,000 as money employed in buying or trading in paper,
or in regular exchange, and did assess them for taxation in
each of said years respectively." On cross-examination he
testified " that he could not tell, without reference to said
assessment books, on what subjects, or for what amounts he
·assessed petitioners during said years, but what he did assess
against them was correctly shown by said assessment books."
He also testified " that he never swore petitioners to any
assessments while he was assessor, but always attested the
assessments."

The petitioners then introduced W. G. Robertson, who tes-
tified that he was deputy-assessor during the years 1875 and
1876. And in the spring of 1875 he had several interviews
with the petitioners relative to the assessment of the subject
of taxation mentioned by the witness McDuffie, and like him
declined to make any assessment upon them. But in the
spring of 1876 he furnished a blank printed list of assess-
ment to the petitiohers, and made repeated applications to
them for an assessment of these taxes. He was told that

[Lehman, Durr & Co. v. Robinsen.]

the petitioners "found great difficulty from the manner in which their business was conducted, in separating and determining the different amounts, which they should return on the diferent subjects of taxation; and that after discussing the matter, and on the assurance of the petitioners that it was the best they could do, agreed to take an assessment of $75,000, covering all of the following subjects of taxation, namely: salaries, gains, incomes and profits of preceding year; money hoarded or kept on deposit subject to order;. money loaned and solvent credits or credits of value;. money employed in buying or trading in paper, or in regular exchange and gross amount of commissions of factors, brokers, and commission merchants.

"The court, having considered the cause upon the pleadings and evidence, adjudged that the assessments made on some of the subjects of taxation for each year from 1869 to 1876, both inclusive, were made without authority in law or jurisdiction in the collector; and adjudges that the same be quashed, annulled and vacated.

"The court further now adjudges the other assessments. made by said tax-collector, as shown in his answer to the writ of *certiorari* were lawfully made; that Robinson, as tax-collector and special assessor, had the the jurisdiction to. make them, and that they were made in the manner as the. law requires, adjudges they shall remain in full force and effect, and as to them the petition and writ of *certiorari* be. dismissed. The court further adjudges, that petitioners,. Lehman, Durr & Co., pay the cost of the proceeding, for which execution may issue. From which judgment the petitioners,. so far as any assessment is held legal, and that respondent, Robinson, as tax-collector, had jurisdiction to make, and the. dismissal of the the writ of *certiorari* and petition, pray an appeal to the Supreme Court, which is granted upon their entering into bond and security for costs; and the judgment as to assessments here held good, and collections under them will be stayed and suspended upon their entering into a *supersedeas* bond in the sum of ten thousand dollars.

"From the judgment of the court, so far as the adjudging said assessments made without jurisdiction, and the judgment not dismissing the petition and writ of *certiorari*, the defendant, as said tax-collector, prays an appeal to the Supreme Court, which is granted upon his entering into bond for costs."

D. S. TROY, and CLOPTON, HERBERT & CHAMBERS, and VOL. LIX.

[Lehman, Durr & Co. v. Robinson.]

WATTS & SONS, for Lehman, Durr & Co.—1. The question presented in this case is whether or not the tax-collector had any power to make in March, 1877, the assessment of taxes against Lehman, Durr & Co. shown in the record? The action of the tax-collector in making the assessment, is that of a tribunal of limited authority exercising judicial powers. Cooley on Taxation, 550; 5 Mass. 559; 3 Denio, 117; 35 N. Y. 238; 4 N. Y. 246, 352; 7 Barb. 133, 129; 43 ib. 540; 48 ib. 51; 19 ib. 22; 47 ib. 320; 53 ib. 239. When any person has authority to hear and determine a question, their determination is in effect a judgment.—Cooley on Tax. p. 268, note 3; Freeman on Judgm. § 531; 24 Barb. 419; 43 Ill. 428; 50 Ill. 424; 2 U. S. Dig. (N. S.) p. 668. And such judgments are conclusive till set aside by a competent appellate court. Authorities, *supra;* 2 Dutcher (N. J.) Law, 219, 228; 7 Barb. 127–133.

2. A board of equalization has no power to increase the valuation of property made by the assessor, without notice to the owner.—13 Cal. 325; 28 Cal. 107; 25 ib. 300; 34 ib. 432; 14 Conn. 72; 18 Conn. 189. Statutes authorizing collection of taxes must be strictly pursued—and this must be shown.—31 Ga. 700. When the report of the collector does not substantially comply with the act, a judgment rendered for taxes is void.—15 Ill. 279. The tax-collector can not assess except when authorized.—15 Ind. 48; 21 ib. 335. A judgment of a court of special jurisdiction must aver every fact necessary to confer jurisdiction upon such tribunal; nothing is presumed as to its jurisdiction.—Freeman on Judgments, § 517; 31 Ga. 700. The return to the *certiorari* must show every fact showing the jurisdiction of the tax-collector to make the assessment.—Cooley on Taxation p. 508–10; 30 Mich. 201.

3. The tax-collector exercising the power under the statute to assess taxes, must show the person assessed escaped the tax-assessor.—Section 7 Revenue Law; Acts 1875–6. p. 61. His ordinary powers are to collect taxes. This section gives extraordinary powers. The offices of tax-assessor and tax-collector are distinct, and the same person can not perform the duties of both at the same time. The collector has power to assess taxes of persons only who have *escaped the tax-assessor,* not the taxes of persons who have escaped taxation, and the power is only to assess such persons for the current year.

4. The legislature must be presumed to know the meaning of language, and when one set of words is used in one section,

and another in another section, the presumption is that the legislators intended to convey a different meaning, if the two sets of words ordinarily have different meanings.

5. The exercise of the power of assessment is judicial. Authorities *supra*. And in all cases the jurisdiction must appear by recital of facts, showing authority to act. Every assessment must be submitted to the Commissioners Court for revision. The collector has no authority to revise the judgment of the assessor thus affirmed and approved by the Commissioners Court. But the construction insisted on by. respondent necessarily gives this power. This of itself shows the legislature intended to give the power of assessment to those persons only who had not been assessed at all by the assessor—and which assessment had not of course been revised by the Commissioners Court. This construction does no harm to the State.

6. There is no provision of the statute for making an assessment without notice to the tax-payer. The assessor can make no assessment without personal application or notice to the tax-payer. Assessment upon information, and not upon a return of the tax-payer, is highly penal. And there is no authority granted to the tax-collector to assess taxes upon mere information. The failure of the tax-payer to give in his property upon a proper demand, is a misdemeanor. Acts 1875-6, p. 85, § 3.

An assessment by the assessor on the 12th of March, 1877, of property which had escaped assessment in several years, upon information, would have been void ; and supposing the collector to have all the power of the assessor, where does he get the power to assess taxes upon information before the tax-payer has been put in criminal default by a demand and delinquency extending to the first of June ?

7. To maintain that the tax-collector has power to assess persons who have been assessed by the assessor, but having some property which has escaped taxation, the counsel for respondent are driven to assert the following proposition, viz. : *First*, that "persons," used in section 7, p. 61, Acts 1875-6, does not mean what is ordinarily understood by the word, but persons *as the representatives of property which is liable to taxation;* and that taxes are not personal charges, but charges upon your property. This is refuted by Hillard on Taxation, p. 15.

That the words "persons who, or property which, have escaped taxation" are synonymous with the words "persons who have escaped the tax-assessor." Whereas, one escapes

[Lehman, Durr & Co. v. Robinson.]

the act of taxation, and the other escapes the officer—tax-assessor.

That the words used in relation to the assessments by the assessor, must be interpreted in the section relating to assessments by the collector—which would be judicial legislation. The statement of these propositions is sufficient for their refutation.

8. It is said revenue statutes should be liberally construed, and some authorities are cited to support this view. But this construction is never indulged to sustain the extraordinary power of any officer where the acts affect the rights of the citizen. The legislature has the right to levy taxes, and in the exercise of this power, a liberal construction is allowed on the statute. But to hold that such a construction should be placed on the powers of tax-collectors, would be to reverse the decisions of all courts.

9. From the foregoing argument the following propositions are deduced, viz.:

The revenue laws constitute a system that must be so construed as to make its provisions harmonize.

The officer *specially* charged with the duty of making assessments is the assessor, and when he makes an assessment it is a determination of the property and subjects of taxation of the individual assessed liable to taxation, and of the value or amount. And this assessment must be examined by the Court of County Commissioners, and the errors, if any, should be corrected by it. This is a judicial ascertainment by a court of competent jurisdiction of the correctness of all assessments in which no errors are found.

The officer *specially* charged with the duty of collecting the taxes, is collector. His warrant of authority to collect is the assessment as corrected by the Court of County Commissioners. He has no power to diminish, enlarge or alter it in any respect, or to revise them.

However, some person or property may nevertheless escape taxation in previous assessments without being discovered at the time by the assessor, or by the Court of County Commissioners. But such property must be assessed by the assessor when discovered, and such assessment must be examined by the Court of County Commissioners, as the previous assessment had been.

But some persons may escape the assessor altogether whilst he is assessing for the current year, so that no assessment is made against them. In such cases the tax-collector may assess

while engaged in the collection of taxes—and no power is given him to assess persons previously assessed.

By this construction no conflict of jurisdiction arises between the assessor and the collector; no unnecessary burden is imposed on the tax-payer, and all the provisions of the laws are harmonized.

JOHN W. A. SANFORD, Attorney-General, with whom were RICE, JONES & WILEY, for Patrick Robinson.—1. This is an application for a writ of *mandamus*, or a writ of *certiorari*, to be directed to the tax-collector of Montgomery county. The case must be considered as if there were two petitions, because the writs prayed for perform different functions. One sometimes lies to compel action; and the other to rectify action after it has been taken.—21 Ala. 772.

2. A writ of *mandamus* will lie only when there is a specific legal right, and no other legal remedy adequate to its enforcement.—2 Brick. Dig. p. 240, § 4. But the court will not require any officer to do an act which is not expressly and specifically authorized by law, in a proceeding by writ of *mandamus*.—41 Ala. 198; Cooley on Taxation, 523.

It may be addressed to an inferior court to compel action, but will not determine how that court shall act in a matter in which it has discretion.—21 Ala. 772. Here a *mandamus* has been prayed, requiring the tax-collector to vacate and set aside an assessment made by him in the regular discharge of his duties. It is argued that an assessor is a *quasi* judicial officer of limited power. And when the collector acts as assessor he becomes of the same species, with still more restricted authority; that his powers are judicial, and he is an inferior tribunal. If this be so, no writ of *mandamus* will run against the tax-collector because he has acted, and this writ will not be granted to correct the errors of an inferior tribunal, however gross they may be.—High on Ex. Rem. pp. 128–9; 18 Wend. 79, 92, 93; 24 Ala. 98. Therefore, if the tax-collector be a *quasi* judicial officer, the court erred in its refusal to strike from the files the petition for a *mandamus*.

3. But if the tax-collector be a ministerial officer, still the writ of *mandamus* should not be granted.—1 Mason C. C. Rep. 504; 1 Brock. 188. The petitioners, Lehman, Durr & Co., have other adequate remedies for any wrong the tax-collector may inflict. The board of revenue has ample powers to afford relief. It was established in 1875, Acts 1874–5, p. 513; and has all the powers of a court of county commissioners, Acts 1876–7, p. 162. This court has power to cor-

rect assessments, Acts 1875–6, p. 67: Besides special sessions that may be called, the board has four regular sessions annually. On the 12th of March the assessment was made by the collector, and on the ninth of April thereafter the board held one of its regular sessions. To it an application for relief could have been made. This was a tribunal expressly provided to correct erroneous assessments. The appellants had an adequate remedy before it. The court, therefore, erred in entertaining the petition against the objection of the respondent.

4. The demurrer to the return of the respondent was properly overruled. The first ground could not be sustained. In such a proceeding, as in other cases, what is not denied or avoided is admitted when well pleaded.—High on Ex. Rem. §§ 461, 592. The other grounds of demurrer are also untenable. They are based on the want of authority in the collector to make the assessments. This is the core of the case. The power of the State to tax for public purposes, all persons and property within its jurisdiction, in the absence of constitutional restrictions, is unlimited.—4 Wheat. 316 ; 2 Pet. 449 ; 7 Wall. 71 ; Cooley on Tax. 41–42 ; Cooley on Const. Lim. 487. But its purpose to levy a tax must be expressed in a clear, certain and unambiguous statute, whose object is to raise revenue.—1 Barn. & Cresw. 424 ; 4 ib. 200-8 ; 6 ib. 241-2 ; 2 Barn. & Ad. 58 ; 3 Barn. & Ad. 641. And revenue laws must be construed liberally so as to effect the purpose of their enactment.—10 Wall, 395-406 ; 3 ib. 114-145 ; 3 How. 197–210 ; 2 Abbot U. S. Rep. 305–314 ; 38 Conn. 443-7.

5. The State then, has full power to enact revenue laws. They must be so construed as to effectuate the object of raising revenue. It provides for assessors and collectors. The latter to a limited extent performs the duties of the former. They can assess " persons who have escaped the assessor." And persons may be said to have escaped the assessor, when they have not been assessed at all, or when any property or subject of taxation has not been assessed. But this does not confer on the collector the power to revise the acts of the assessor. He assesses only what the assessor, for any cause, failed to assess. Such a bare failure, from a mistake of the law, can not estop the State.—1 Mason Rep. 504 ; 5 ib. 441-2 ; 23 Ark. 374.

6. After overruling the demurrer to the replication of the petitioners, the court should not have granted a writ of *certiorari*. Nor should testimony, oral and written, have been

admitted to contradict the return.—Cooley on Tax. 535; 5 Allen, 13-16; 109 Mass. 270. Nor should the *certorari* have been issued at all to the tax-collector. He had reported the assessments to the judge of probate, who had entered them in the book of assessments as required by law. The transaction was no longer under his control.—Cooley on Tax. 531. In making the assessment the collector exercised no extraordinary powers. It was an ordinary duty, as plainly prescribed as any function required of him by law. To assess the persons " who had escaped the assessor" is as clearly his duty as to collect taxes from those regularly assessed. The return made to the writ of *certiorari* needs only to be certain to a common intent in general.—9 Conn. 456.

7. With the exception of a license tax, or a privilege or occupation tax, all taxes in Alabama are taxes on property. Even a poll-tax is such.—9 Ala. 556. And the legislature meant by the phrase to assess " persons who had escaped the tax-assessor," to authorize the assessment of taxes on property that had escaped the assessor. Of course, this includes subjects of taxation as distinguished from taxable property. 38 Ala. 159-160. And no act of the assessor, not in accordance with law, can excuse the tax-payer's failure to be assessed, or to pay taxes. Nothing, except the official act of the assessor, can protect the citizen from an assessment by the collector.—23 Ark. 374.

8. For the protection of the State, as well as the citizen, assessment is an inseparable incident to taxation, and no right of action arises until a " legal assessment is made by some proper authority," and he can receive no discharge from his liability until an assessment is made.—Hilliard on Taxation, 291; Cooley on Taxation, 259-260. A person who has *partially* escaped the assessor differs from a person who has totally escaped him only in degree, and not in kind.

Neither *certiorari* nor *mandamus* is a proper mode of seeking relief which the petitioners desire, on the facts in this case.—Cooley on Taxation, 533, and notes; 1 Hill (N. Y.) 195; 15 Wend. 198.

9. In reviewing a case on *certiorari*, the court is confined to the record of the tribunal reviewed.—Cooley on Taxation,. 535. Extrinsic evidence can not be received to contradict or control it.—Ib. 535; 12 Ala. 176; 5 Allen, 16.

10. No court has power to apportion a tax or to make new assessments, or direct another to be made by proper officers of the State. The levy of taxes is not a judicial function. 2 Otto, 614-15; 19 Wall. 660. The mistakes of an assessor,.

in making or omitting to make a proper assessment on a particular subject of taxation, or species of property, can not bar the claim of the State.—5 Pet. 187-8; 7 Cranch, 369–370; Cooley on Taxation, 143, and note 1. To prevent an escape from taxation, and secure protection to the State and the public, the revenue law carefully clothes the assessor and collector with concurrent powers, to make assessments of persons, who have escaped the assessor.

STONE, J.—Under the act "designating the subjects and sources, and prescribing the rates and mode of taxation," approved February 9th, 1850—Pamph. Acts, 3—are found the following provisions:

"Sec. 3. . . . Property shall be assessed in the county where it is at the time, or was on the first day of March preceding the assessment; and in the case of land, where a tract lies partly in one county and partly in another, that county in which the greater part lies; but all property [is] liable to be taxed in some county; and the assessor, as well as the collector, and other officers, shall take care to make diligent inquiry, and embrace all property which has escaped taxation since the year 1843, as well as all that is liable at the time, so as to render the burthen equal and uniform as possible, on all tax-payers alike."

In the act "prescribing the mode of electing, and defining the duties of tax-assessors and collectors," approved February 11th, 1850—Pamph. Acts, 12—are the following clauses:

"Sec. 5. . . . And the assessor shall annually assess and value all real estate that may have been omitted, or have become taxable since the last assessment, and such as may have materially increased or decreased in value; and where the ownership is changed, he is required so to change the name as to show the real owner.

"Sec. 12. That it shall be the duty of each and every tax-collector diligently to inquire for any and all property of every species, subject to taxation by the revenue laws of this State, which from any cause may not have been assessed, either for the current year, or for any year since 1843, and particularly to inquire of any person or persons who may have recently moved into their respective counties from any other county or counties in this State, and who may not have paid taxes on their property, and to assess the same in the same manner, and under the same restrictions, that assessors, appointed by the provisions of this act are required

to do ; and after such assessment is thus made, and entered into the said books above provided, to collect the taxes thereon, as if the same had been assessed by the assessor; and the said tax-collector shall return the assessment thus made, under oath, to the several assessors of the counties in which said property is assessed, who shall add up the respective amounts, and make and send copies to the Comptroller, in the manner and under the same penalties imposed in reference to original assessments by assessors," &c.

The substance of the foregoing statutory provisions was carried into the Code of 1852. Speaking of the duties of the tax-assessor, that Code said : "Section 433. All property subject to taxation, and not assessed, in any year since 1843, must be assessed to the person such property should have been assessed, the year or years it escaped assessment; and in such cases the assessment must show the years such property was not assessed, the assessment for each of such years, and the persons to whom assessed for each year."

Under the title " Duties of the tax-collector," that Code said : " Section 453. It is the duty of the tax-collector :

" 1.   .      .      .      .      .      .      .      .      .

" 2. To assess, as required under the provisions of this chapter, any property that has not been assessed, and to collect the taxes thereon.

" 3. To note in writing any errors made in the assessment of property."

In the act " To establish revenue laws of the State of Alabama," approved February 22d, 1866—Pamph. Acts, 3— are the following provisions :

" Sec. 33. That whenever the assessor shall discover persons who, or property which have escaped taxation in any previous assessments, he shall assess the taxes thereon for such years as such persons or property have escaped taxation, and where he has reason to believe that any person who has been assessed, is about to leave the county, he shall at once notify the tax-collector, and on the failure of the tax-collector to act, he shall collect the taxes of such person, and pay the same over to the tax-collector, taking his receipt therefor.

" Sec. 52. That it shall be the duty of the collector, while engaged in the collection of taxes, to assess the taxes of all persons who have escaped the tax-assessor, entering up all such assessments in the back part of the books of assessments for each year."

The Revenue Law, approved February 19th, 1867, Pamph.

Acts, 259, contains the same provisions, numbered as sections 32 and 51. Each of said statutes contains a repealing clause. The statute last mentioned enacts as follows:

"Sec. 108. That the act to secure taxes from transient dealers, and all laws and parts of laws conflicting with the provisions of this act be and the same are hereby repealed."

Under these statutes, the author of the Revised Code, in lieu of section 433 of the Code of 1852, substituted section 33 of the act "To establish revenue laws for the State of Alabama," copied above; and numbered the section 480 (433). This was done, manifestly, because the statute was the later expression of the legislative will, and the repealing clause in the act, repealed section 433 as it originally stood. So, section 52, copied above, of the Revenue Law of 1866, covers the ground of that portion of section 453 of the Code of 1852, which we have copied, and repealed it. The rule is, that if there be any part of the statute which can not stand with any of the provisions of a former law, to such extent the later enactment repeals the older. Yet, the codifier, while incorporating said section 52 in his Code, as section 501 (454e), still retained, in its entirety, said section of the original Code, and numbered it 496 (453). But, possibly we need not consider this.

Several revenue laws have been enacted, since the one of 1866.—See Acts of 1867, page 259; Act of 1868, page 298, sections 39 and 50; Act of 1875, page 3, sections 32 and 46, and Acts of 1875-6, pages 56 and 61, sections 6 and 7. In each of these enactments, when declaring the duties of the assessor, the language employed is, "whenever the assessor shall discover persons who, or property which have escaped taxation in any previous assessment, he shall assess the taxes thereon," &c. While, in speaking of the duties of the tax-collector, the language invariably employed is, "it shall be the duty of the collector, while engaged in the collection of taxes, to assess the taxes of persons who have escaped the tax-assessor." The act of 1868, approved December 31st, like the statutes of 1866 and 1867, repeals "all laws or parts of laws, of a general or special character, except those enacted for municipal purposes, upon the subject of taxation in this State." So also, the act approved March 19th, 1875, and the act approved March 6th, 1876, each contains a repealing clause, which would, of itself, repeal the provisions of the act of 1850, and the special sections of the two editions of the Code which we have been considering, independent of the repugnancy, which repeals by implication.

[Lehman, Durr & Co. v. Robinson.]

Lehman, Durr & Co., a firm doing a somewhat varied business, had had their taxes assessed by the tax-assessor for each preceding year. The tax-collector, claiming that in each of the years since 1869, they were the owners of property and other subjects of taxation which should have been but were not assessed, proceeded on information to assess them for such alleged subjects of taxation, as *persons who had escaped the tax-assessor*. The question is raised, had he authority to do so?

It will be observed that while the statute of 1850 and the Code of 1852, employ substantially the same language in conferring power severally on the assessor and collector in the assessment of taxes which had 'escaped taxation, from 1866 to the present time the powers of these officers have been expressed in different language.

In Potter's Dwarris on Statutes, 175, speaking of the laws of their interpretation, it is said, "the design and intent of the former, where it can be indisputably ascertained, shall prevail; *quod verba intentioni inservire debent*. If such be the case, as a maxim of universal jurisprudence it will be of constant application: it will extend under partial modifications, to the interpretation of all instruments; wills, deeds and grants, equally with the construction of statutes." On page 200, the same author, quoting from V. C. Wigram, says, "In construing an act of parliament, the same rules of construction must be applied as in the construction of other writings."—See *Salkeld v. Johnston*, 1 Hare, 210.

Words must be construed in their popular sense, unless there is something in the writing which shows they were intended to be employed in some other sense. "The words of a statute are to be taken in their ordinary and familiar signification and import, and regard is to be had to their general and proper use; for *jus et norma loquendi* is governed by usage; and the meaning of words, spoken and written, ought to be allowed as it has constantly been taken."—Pot. Dwar. 193.

In construing a statute, regard must be had to the whole act; and, if need be, to other statutes passed on the same subject; for it frequently happens that the meaning of one clause is shown by another that is not stated in connection with it. The object being to ascertain the framer's intention in the use of the language he employs, that intention is often-times more certainly learned by comparing one clause with another, and noting their correspondences and differences. In Sedg. on Cons. and Stat. Law, page 200, it is said that

"in construing any part of a law, the whole must be considered; the different parts reflect light on each other; and, if possible, such a construction is to be made, as will avoid any contradiction or inconsistency." So, in Pot. Dwar. 188, it is said, "it is the most natural and genuine exposition of a statute, to construe one part by another of the same statute, for that best expresses the meaning of the makers."—See also, ib. 189. So Chancellor Kent, 1 Com. 461-2, says, "it is an established rule in the exposition of statutes, that the intention of the law-giver is to be deduced from a view of the whole, and of every part of a statute, taken and compared together."—See also *U. S. v. Collier*, 3 Blatch. 333.

"Statutes are to be so construed, if possible, as to give same effect to every clause, and not to place one portion in antagonism to another." A construction which leaves to a sentence or clause of a statute no field of operation, should be avoided, if any other reasonable construction of the language can be given.—*Brooks v. Mobile School Commissioners*, 31 Ala. 277; Sedg. Cons. and Stat. Law, 200; Pot. Dwar. 189, 194, 197; *Torreyson v. Board of Examiners*, 7 Nev. 19.; *Leversee v. Reynolds*, 13 Iowa, 310; *City of San Francisco v. Kelsey*, 5 Cal. 169; *Aldridge v. Mardoff*, 32 Texas, 204.

Words or phrases twice used in the same statute, are presumptively used in the same sense. "If the same words occur in different parts of a statute or will, they must be taken to have been everywhere used in the same sense."—Pot. Dwar. 194. But, "if there be a material alteration in the language used in the different clauses, it is to be inferred that the legislature knew how to use terms applicable to the subject-matter."—Pot. Dwar. 198. In Edrich's case, 5 Rep. 118, a question arose on varying phraseology in a statute. "The judges said, they ought not to make any construction against the express letter of the statute. . . and the several inditing and penning of the former part [of the statute] concerning distress given to executors, and of this branch, doth argue that the makers did intend a difference of the purviews and remedies, or otherwise they would have followed the same words."

In *Rich v. Keyser*, 54 Penn. Stat. 86, the question arose under two statutes, each of which gave to a landlord a summary remedy to dispossess his tenant who held over. The act of 1772 gave the remedy before two justices of the peace, when the term was ended, and three months notice to quit had been given, and the tenant had neglected and refused to do so. Under this statute it was ruled sufficient, if the three

months notice to quit was given before the commencement of the proceedings, although after the termination of the lease. By the act of 1863, the remedy was given before a single justice or alderman. The language of the later statute was, "where any person or persons in this State having leased or demised any lands or tenements to any person or persons for a term of one or more years, or at will, shall be desirous upon the determination of said lease to have again and repossess such demised premises, having given three months notice of such intention to his lessee or tenant, and said lessee shall refuse to leave," &c. This statute further provided that on the hearing before the justice or alderman, it should be proved that the term is fully ended, " and that three months' previous notice had been given." It was contended for plaintiff that, as ruled under the act of 1772, it was sufficient under the later statute if the notice to quit was given three months before the institution of the proceedings to dispossess. The court, speaking of the act of 1863, said, "The phraseology of this section in both places where the notice is mentioned, does certainly imply that the notice is to be given three months before the expiration of the term. The expiration of the term is the period which the legislative language assumes, and "having given three months notice," means that at *that period* having given it; and *three months previous notice,* means previous to that period—the end of the term. . . Herein the act of 1863 plainly differs from the act of 1772. Was the discrepancy accidental or intentional? The legislature of 1863 must be presumed to have known what the language of the act of 1772 was, and what judicial construction had been placed upon it. Then, knowing this, and yet not following it, but substituting for it different language, did they not mean that we should construe their language according to its ordinary import? I see no other ground for judicial construction to rest upon. Indeed, the words of a statute, when unambigious, are the true guide to the legislative will. That they differ from the words of prior statute on the same subject, are an intimation that they are to have a *different,* and not the *same* construction; for it is as legitimate use of the legislative power to alter prior statutes, as to displace the common-law." In this case, it will be observed, the old statute had stood as a rule for giving notice in such cases for near a century, before the second statute was enacted.

The case of *Moses v. Newman,* 6 Bing. 556, raised the question of the construction of section 5 of the bankrupt act

[Lehman, Durr & Co. v. Robinson.]

of 6 George IV. The language of the section is as follows : "That if any trader, having been arrested or committed to prison for debt, or on any attachment for non-payment of money, shall, upon such, or any other arrest or commitment for debt or non-payment of money, or upon any detention for debt, lie in prison for twenty-one days, or having been arrested or committed to prison for any other cause, shall lie in prison for twenty-one days after any detainer for debt lodged against him, and not discharged, every such trader shall be thereby deemed to have committed an act of bankruptcy ; or if any such trader, having been arrested, commited, or detained for debt, shall escape out of prison or custody, every such trader shall be deemed to have thereby commited an act of bankruptcy from the time of such arrest, commitment or detention."

One Marshall had been arrested and committed to prison for debt, had lain in prison twenty-one days, and had been therefor adjudged a bankrupt. The suit was by the assignee, and the sole question was whether the bankruptcy should date from Marshall's arrest, or from the expiration of the twenty-one days of his imprisonment. In support of the first branch of the proposition, it was shown that under prior bankrupt laws, where the act of bankruptcy consisted in lying in prison for a given length of time under arrest for debt, the bankruptcy, by relation, took affect from the date of the arrest ; and the Parliament, it was contended, must be presumed to have intended such relation under the present statute. But the court held otherwise. C. J. TINDAL, delivering the leading opinion of the court, said, "that in the one case, the act of bankruptcy shall be reckoned from the end of the twenty-one days ; in the other, from the first arrest. And the distinction may be said to appear historically ; for the clause of relation is omitted in the first statute, 1 Jac. I, ch. 15, inserted in the next, 21 Jac. I, ch. 19, and continued ever since till the passing of the 5 G. IV, and 6 G. IV, ch. 16, when it appears to have been omitted by design, the period of confinement constituting an act of bankruptcy having been materially abridged." PARK, J., said : "I am of the same opinion, and think the question historically clear ; for when we observe the legislature sometimes inserting and sometimes omitting the clause of relation, we must presume their attention has been drawn to the point, and that the last omission, at least, is designed." BOSANQUET, J., said : "Seeing that this clause has been omitted after previous insertions, we must consider the omission designed." GASELEE, J.,

concurred.—See, also, *Cantwell v. Owens*, 14 Md. 215. The following authorities are strongly corroborative of the same principle of construction: *Campbell v. Campbell*, 4 Bro. C. C. 15; *Rawlings v. Jennings*, 13 Ves. 39, 45–6; *Nanfan v. Legh*, 7 Taunton, 85.

Commenting on a question kindred to the one we are dis-·cussing, Chief Justice MARSHALL, in the câse of the Schooner *Paulina's Cargo v. U. S.*, 7 Cr. 52, 60, said: "In construing these laws, it has been truly stated to be the duty of the ·court to effect the intention of the legislature; but this intention is to be searched for in the words which the legislature has employed to convey it. The legislature has declared .its object to be to lay an embargo on the vessels of the United States, and to prevent the transportation of any article whatever from the United States to any foreign port or place; and therefore such transportation is prohibited. To prevent evasions of this law, certain acts which do not in ·themselves amount to a breach of the embargo, but which may lead to it, have been successfully prohibited under such penalties as the wisdom of Congress has prescribed. . . . But should this court conjecture that some other act, not expressly forbidden, and which is in itself the mere exercise of that power over property which all men possess, might .also be a preliminary step to a violation of the law, and ought therefore to be punished for the purpose of effecting the legislative intention, it would certainly transcend its own ·duties and powers, and would create a rule instead of applying one already made. It is the province of the legislature to declare, in explicit terms, how far the citizen shall be restrained in the exercise of that power over property which ownership gives; and it is the province of the court to apply ·the rule to the case thus explicitly described—not to some other case which judges may conjecture to be equally dangerous."

Speaking of the legislative intent which is to govern in the construction of statutes, in Potter's Dwarris, 182, it is said, "it must be such an intention as the legislature have used fit words to express. Although the spirit of an instrument is to be regarded no less than its letter, yet the spirit is to be collected from the letter."

In Cooley's Cons. Lim. 55, it is said: "In the case of all written laws, it is the intent of the lawgiver that it is to be ·enforced. But this intent is to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey it, and unless examination

.demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it. Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. Possible, or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere."

What we have shown above is, we think, ample elucidation of the principles which must govern in the interpretation of chapter 5, section 6, and chapter 6, section 7, of the revenue law approved March 6th, 1876, under which the present assessment was made. It will be observed that for many years, commencing in 1850, the powers of the assessor and collector in regard to escaped taxes, were conferred in language substantially the same, and must, therefore, have been co-extensive. We have shown, further, that in the revenue law of 1866, and in every one since, there has uniformly been a difference in the language which defined their several powers, while the language applied to each has undergone no change. "Persons who, and property which have escaped taxation," is the stereotyped mandate to the assessor; while for the same unbroken period, the authority to the collector to assess, has been expressed in the words, "persons who have escaped the tax-assessor."

Under the rules above laid down, we now proceed to draw the conclusions applicable to this case, which we think those rules and principles force upon us:

*First.* The legislature, in speaking of the duties of the asesssor, use the compound phrase, "persons who," and "property which." They must have had some object in using the last branch of the sentence; must have thought it embodied some idea, and that, that idea was not embraced in the first branch. To hold otherwise, would be to convict them of a persistent employment of language, having no aim or meaning; a mere tautology. It is our duty, if we can, to attach some meaning to every part of a statute. If, then, the words, "property which," have any independent meaning when applied to the assessor, then the powers conferred by that clause on the assessor are not conferred on the collector. Only "persons who have escaped the tax-assessor," are committed to his jurisdiction. The words, "persons who," being found in identical language in each grant of power, and the two grants being in one and

[Lehman, Durr & Co. v. Robinson.]

the same statute, with no surroundings to indicate that they were employed in a different sense, it is our duty to presume the legislature, in each section, intended to convey the same and no other idea, and to confer the same and no other power,. by the words, " persons who," which are common to both.. If we hold that the legislature intended to confer the same powers on each of these officers, we thereby convict them of employing the words, " property which," without purpose or meaning, or, of using the words, " persons who," in one sense as to the assessor, and in another and larger sense as to the collector.    Each of these constructions is alike forbidden by the principles and adjudged cases stated above.

*Second.*  The legislature, at one time, conferred powers, in language substantially identical, on the assessor and collector, in reference to tax assessments previously overlooked, or withheld.    Subsequently a change was made in the language of the statute, by which the powers were conferred on these officers in separate sections, and in changed and varying language.    This changed language, differing as to the separate powers of the two officers, was preserved and persevered in, without alteration in any respect material to this case, in the several revenue statutes, extending through a period of five years.    The authorities cited above show, that when the legislature makes a material change in the language of a statute, we must presume they intended what their changed language imports—a changed meaning.

*Third.*  To hold that the collector has co-equal powers with the assessor in the matter of taxes of " persons who and property which have escaped taxation," is, in effect, to arm him with the authority to supervise and review all assessments made in past years by the assessor, whenever, in his opinion, such assessment is incomplete as to subjects of taxation, or values affixed, and this, running through all previous assessments ; we can not think such was the intention of the legislature.

*Fourth.*  We think the language of the statute, *ex vi terminorum,* forces a discrimination in the powers of the two officers.    The transitive verb, *escape,* in the sense here employed, means " to avoid the notice of ; to pass unobserved by ; to evade."    One who has been assessed by the assessor, although imperfectly, does not fall within either of these definitions.    He has not *avoided the notice of* the assessor,. has not *passed by* him *unobserved,* has not *evaded* him.    In no sense, popular or natural, can it be affirmed of such person that he has " escaped the tax-assessor."

Vol. lix.

[Lehman, Durr & Co. v. Robinson.]

Chapter 5, section 14, of the revenue law of 1876, fixes the rate of commissions to be paid the assessor for assessing taxes. After providing a tariff of rates for ordinary assessments, it adds: "Upon the amount of taxes assessed upon property which has escaped taxation in assessments for the previous years, ten per cent." The same rate is also allowed him for similar county assessments. It may be argued that under the construction we have given above to the varying phraseology as to the two officers, to be consistent, we must deny to the assessor all compensation for assessing taxes of "persons who" have escaped taxation in any previous assessment; as the law allowing the enlarged compensation to him only applies to "property which has escaped taxation." The phrase, "property which has escaped taxation," is much more comprehensive—much more nearly generic, than the phrase, "persons who." The former embraces everything covered by the latter, except the simple item of poll-tax. We all agree that the words "property," when employed in those sections, is the equivalent of *subjects* of taxation. To hold otherwise, would be to allow neither officer any compensation for either assessing or collecting taxes, other than those levied on property proper. Then, the phrase, "property which," is broad enough to take in all the subjects of taxation belonging to every tax-payer, whether he has personally *escaped the tax assessor*, or not, except the single item of poll-tax. It may be that the legislature omitted to provide compensation to the assessor, for assessing this one item of escaped poll-tax, through oversight or otherwise. We can only learn what they intended, from what they have said. It is theirs to command, ours to obey. When their language is plain, no discretion is left to us. We have no right to stray into the mazes of conjecture, or to search for an imaginary purpose to do equal justice to these equally meritorious public officers, and make such imaginary purpose an excuse for placing one construction—giving one unbending interpretation, to phrases essentially different. Better, far better, attribute this failure to accidental omission; a mishap from which the most cautious and practised draftsman is not always free.

Moreover, the language employed in fixing the compensation of the tax-collector for assessing such taxes as he is authorized to assess, follows neither the language found in either of the grants of power to assess escaped taxes, nor the language in which the assessor's compensation is conferred. After defining the scale of commissions for the collection of

(17)

taxes, it adds, " on the amount of taxes by him assessed, ten per cent.;" thus fixing the rate.

We do not think the language of the statute in declaring the compensation for assessing escaped taxes by the assessor justifies us in disregarding the plain canons of interpretation herein above laid down.

If it be contended that under the revenue law of 1866, which so far as the question we have been considering is concerned, has not been materially changed in ten years, the tax-collectors throughout the State have uniformly been in the habit of assessing the taxes on property which has escaped taxation in previous assessments, to the same extent as assessors have been authorized to do ; that this was a cotemporaneous construction of the statute, by officers charged with its execution, and such construction may be looked to, as one of the aids in interpreting the language of the statute ; we answer, first, that we do not know to what extent the habit has prevailed, or whether it has been sufficiently general, to entitle it to be considered as one of the aids in the interpretation.   Second, such interpretation by non-judicial minds, should never be allowed to prevail, or exert influence in the construction of the plain and unambiguous language. When language is plain, there is no room for construction. Third, the statute of 1850, as we have shown in the opening of this opinion, conferred co-equal powers on the assessor and collector, in the assessment of back taxes, or property which had escaped taxation.   That legislative authority existed without material modification for fifteen years ; and during that time, it is fair to suppose—rather, it may be assumed, that assessments of such property were made by the assessor and collector indifferently, as the one or the other officer discovered property which had escaped assessment.   This was clearly legal at that time.   Persons engaged in assessing and collecting taxes are usually not much skilled in the law.   The question of the changed powers of the two officers was never before raised in any court that we are aware of.   These officers would be more likely to fall into and follow a habit they found prevailing, than to study the statute, or take counsel with a view of learning the extent of their powers under it.

We think if collectors, since 1866, have been in the habit of assessing back taxes co-extensively with assessors, it is to be credited rather to the precedent they found and followed, than to any interpretation they placed on the language of the statute of 1866, and those following it.

[Lehman, Durr & Co. v. Robinson.]

The revenue laws have, with studied care and particularity of detail, provided that ample notice shall be given to the tax-payer, and opportunity afforded him to be present and be heard when taxes are assessed against him. The assessor is required to give thirty days notice of the time he will attend in each precinct, by bills posted at five or more public places in the precinct; and must attend twice in each precinct, that the tax-payers, thus notified, may meet him, and be present at the making of their tax lists, and after making and filling these two appointments, " he shall make a demand in person, or by deputy, upon delinquent tax-payers, or such as have failed to meet him at his appointments, wherever he may find them, and when unable to find them he may leave a written notice at the residence of such delinquent," &c. After all these prerequisites have been complied with, and not till then, having failed to procure " from any delinquent his list of taxable property before the first day of June, the assessor shall ascertain, from inquiry or otherwise, the property and other items of taxation upon which such person is liable to be taxed, to the best of his information and judgment."—See Rev. Law of 1876, chap. 5, §§ 2, 4, 5. And the act " to prescribe and regulate the mode of assessment in this State," approved February 8, 1877, Pamph, Acts, 3—makes more emphatic, if possible, the requirement that the tax-payer shall have the privilege of appearing before the tax-assessor, when his property is assessed for taxation.

It will be observed that under these statutes, before the assessor assesses any one's taxes on personal knowledge, or on information obtained on *inquiry*, he must first put him in the category of a delinquent, by affording him two advertised opportunities to meet him in the precinct, and there, by personal demand made on him, or left at his residence, if unable to find him. It may be said that these provisions relate to the regular assessment, and not to the exceptional assessments of property which has escaped taxation. True, section 6 chap. V, declares " that whenever the assessor shall discover persons who, or property which have escaped taxation in any previous assessment, he shall assess the taxes thereon for such years as such persons or property have escaped taxation." Nothing said in this section about notice, demand, or the presence of the tax-payer. *Discover*, is the language used. How discover? Is it reasonable to hold that such assessment is, at all times, to be made privately and *ex parte?* If on information, how obtained, how authenticated? How much information, and how communicated, is the assessor to

have, on which he can say officially that he has *discovered* " property which has escaped taxation?" Is it consonant. with the fairness of official dealings that the taxable property of any and every tax-payer shall be made the subject of an *ex parte* inquisition, when such owner is near at hand, and may be notified? Such is not the usual course of official transactions. We think that under the general policy indicated by the statute from which we have copied, no assessment should be made of property which it is alleged has escaped taxation, without notice first given to the tax-payer, if he is accessible. In the case of *City of Philadelphia v. Miller*, 49 Penn. State, 440, the Supreme Court of Pennsylvania, speaking of a tax proceeding, said: " Notice, or at least the means of knowledge, is an essential element of every just proceeding which affects rights of persons or property." In *Darling v. Gunn*, 50 Ill. 424, it was said: " It is eminently just that no person should be deprived of his property without being heard; and it may be that he can not, until such opportunity is afforded, even in the assessment of taxes for the support of government." In *Builer v. Supervisors*, 26 Mich. 22, the court, Judge Cooley delivering the opinion, said: " The power to tax is indeed plenary; but taxation implies public interest; and in cases like these now in question, it also implies proceedings *in pais*, in some of which the tax-payers have a right to take part and be heard." In the case of *Cleghorn v. Postlethwaite*, 43 Ill. 428, it was said: " The law never designed that property owners should be put so completely in the power of the assessor, as he would be, did the assessor have the authority, secretly, and without the knowledge of the owner, to re-assess the property." Judge Cooley, in his work on Taxation, 266, says: " We should say that notice of proceedings in such cases, and an opportunity for a hearing of some description, were matters. of constitutional right. It has been customary to provide for them as a part of what is ' due process of law ' for these cases; and it is not to be assumed that constitutional provisions, carefully framed for the protection of property, were intended, or could be construed to sanction legislation under which officers might secretly assess one for any amount in their discretion, without giving him an opportunity to contest the justice of the assessment."

But we do not decide that an assessment of escaped taxes, made without notice, is, for that reason, void.

The tax-collector had no authority to make the assessments. shown in this record, and the same are void.

[Mobile and Montgomery Railway Co. v. Smith.]

What is the remedy when there is an erroneous, excessive, or unauthorized assessment of taxes? Evidently, not an appeal to the courts, in the first instance. Section 3, chapter VII., of the Revenue Law of 1876, provides a remedy that must be first invoked. If the complaint be of the regular assessment, it must be brought before the Court of County Commissioners (Board of Revenue, in this county,) at the August term. If the assessment be made at an irregular time, it should go to the first term of the court afterwards; or, to a special term, as the case may be. Assessments of " property that have escaped taxation;" if complained of as excessive or illegal, should not be collected by coercive process, until passed upon by the Court of County Commissioners, or the court filling its place. Less than this would not be " due process of law." ·

Should an illegal or erroneous assessment fail of correction in the Court of County Commissioners, we will not say the courts of the country will not redress the wrong. The present case was not passed on primarily by the Board of Revenue, and the City Court had no jurisdiction of the case.

In the appeal of Lehman, Durr & Co. the judgment of the City Court is reversed.

The appeal of Patrick Robinson is dismissed. The costs of the two appeals in this court and in the court below are imposed equally on the two parties.

BRICKELL, C. J., dissents from that part of the opinion which declares that the powers of the tax-assessor and tax-collector, as to property which has escaped taxation, are different: but concurs in the conclusion as to jurisdiction of the questions raised.